## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ESTEBAN E. SARMIENTO,** | Civil Action No. 04-4176 (WJM) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **MONTCLAIR STATE UNIVERSITY,** | **HON. WILLIAM J. MARTINI** |
| **Defendant.** | |

Esteban Sarmiento
4 Ainslie Ct.
East Brunswick, NJ 08816
        (*Pro se*)

Stuart Rabner
Attorney General of New Jersey
Nicole S. Morgan
Deputy Attorney General
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625
        (*Attorney for Defendant*)


**MARTINI, U.S.D.J.:**

        This matter comes before the Court on Defendant's Motion for Summary Judgment

pursuant to Federal Rule of Civil Procedure 56.  Defendant moves for an order dismissing the

sole remaining count of Plaintiff's Complaint,[1] which alleges violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  Plaintiff opposes the motion.  This

matter was decided on the parties' submissions.  Fed. R. Civ. P. 78.  For the reasons stated

---

        [1]        Plaintiff's original Complaint is captioned incorrectly as "Amended Complaint."

below, Defendant's motion is **GRANTED** in its entirety, and Plaintiff's Complaint is

**DISMISSED WITH PREJUDICE**.

## BACKGROUND AND PROCEDURAL HISTORY

*Pro se* plaintiff Esteban E. Sarmiento, a Hispanic male with a Ph.D. in Physical

Anthropology, brought this employment discrimination action against defendant Montclair State

University ("MSU") based on MSU's decision not to hire Plaintiff for a tenure-track position as

Assistant Professor of Biological Anthropology.  (Compl. ¶¶ 8-11, 14.)  MSU had issued two

position announcements describing the preferred qualifications for the professorship.  The short

announcement read, in relevant part:

> DESCRIPTION.  Tenure track position in biological anthropology, with a focus
> on teaching introductory physical anthropology as a laboratory science, also
> human variation and medical anthropology are desirable.  Must be committed to
> using information technology in teaching and research.  Candidates must also
> have the potential or demonstrated ability to obtain external funding.

> QUALIFICATIONS.  Ph.D. required, publications and demonstrated record of
> success in teaching, research and professional activities.  Expectations for this
> position include excellence in teaching, scholarship, and service to the
> department, university, community, and profession.

(Morgan Aff. Ex. A; Sarmiento Aff. Ex. 11.)  Dr. Richard Franke, chair of the Anthropology

Department's Personnel Advisory Committee ("PAC" or "the Committee"), testified that he

believed the short announcement was written by the MSU administration.  (Franke Dep. 109:4-

19, 115:19-116:14, Sept. 20, 2005, [hereinafter "Franke Dep. I"]).  MSU also issued a long

announcement, which was for the most part written by the PAC itself (Franke Dep. I 115:14-18),

and which described the desired qualifications as follows:

2

> The successful candidate will be able to teach introductory physical anthropology as a laboratory science. Candidates should also be prepared to teach introductory and upper division courses for majors and for general education; teach Master's level seminars in the department's applied anthropology program; supervise Masters treatises in applied medical anthropology; develop new courses appropriate to the needs of the department in the area of specialization; maintain a commitment to original research and publication; and engage in service to the university and the community. Candidates must be committed to involving students in research and should demonstrate the potential to write successful grant applications.

(Sarmiento Aff. Ex. 11.) The long announcement also requested applicants to "[s]end letters of application along with vita, names of three individuals prepared to write recommendations, and copies of selected publications" to Franke. (*Id.*)

The position was scheduled to commence September 1, 2002. (Morgan Aff. Ex. A.) On October 22, 2001, Plaintiff, responding to the long circular, submitted his *curriculum vitae* ("CV") along with a list of three references and selected publications to Franke. (Pl.'s R. 56.1 Stmt. 4; Morgan Aff. Ex. V.)[2] In all, MSU received approximately 52 applications for the

---

[2]        On motions for summary judgment, Local Rule 56.1 requires each party to submit "a statement which sets forth material facts as to which there exists or does not exist a genuine issue." This is intended to "narrow the issues before the District Court, and it has come to be relied upon by the Court as a vital procedural step." D.N.J. Civ. R. 56.1, cmt. 2. In this case, Plaintiff has submitted a Rule 56.1 statement as well as a separate response to the Defendant's Rule 56.1 statement. Plaintiff's submissions include abundant conclusions and arguments, frequently blurring the line between fact and opinion. This has made it very difficult for the Court to discern the undisputed material facts in this case, and poses a problem in deciding the weight to be given to Plaintiff's submissions. *See Williams v. Borough of West Chester*, 891 F.2d 458, 471 (3d Cir. 1990) ("Evidence whose foundation is deficient must be excluded from consideration [in motions for summary judgment under Rule 56]."). The Court is mindful of Plaintiff's *pro se* status, and has duly afforded Plaintiff's filings considerable latitude. Nonetheless, Plaintiff's submissions are, in large part, highly improper under the Local Rules, and have been considered only to the extent the Court has deemed appropriate. *See Eckhaus v. Conrail*, 2003 U.S. Dist. LEXIS 25045, **16-17 (D.N.J. Dec. 24, 2003); *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 395 (D.N.J. 1998).

position.[3]  (Franke Dep. I 86:12-88:10.)  The PAC's initial evaluation of the applicants utilized a screening instrument which included three criteria: (1) closeness of fit to job description; (2) academic achievement (publications, conference presentations, etc.); and (3) evidence of teaching performance (if submitted).  (Morgan Aff. Ex. J; Sarmiento Aff. Ex. 14.)  Franke testified that the PAC had been instructed by the Dean to bring only three candidates for interviews, because funds were limited.  (Franke Dep. I 72:9-12, 85:16-23.)  The PAC selected and interviewed three female candidates — Julie Farnum, who is white; Teresa Leslie, who is African-American; and Sheila Jeffers, who is African-American.  (Def.'s R. 56.1 Stmt. ¶ 15.)  Plaintiff was not contacted for an interview.  (Compl. ¶ 11.)  The position was ultimately offered to the white candidate, Farnum, who accepted.  (Sarmiento Aff. Exs. 15, 26.)

Julie Farnum's application materials included a cover letter, CV and a position statement describing her teaching philosophy.[4]  (Morgan Aff. Ex. M.)  Her application indicated that she was currently teaching an Introduction to Physical Anthropology course at Indiana University of

---

[3]       Pl.'s R. 56.1 Stmt. 4.  Plaintiff disputes Defendant's assertion that the actual number of applications was 52, and asserts that the number of applications received is uncertain. (Def.'s R. 56.1 Stmt. ¶ 12; Pl.'s Resp. to Def.'s R. 56.1 Stmt. ¶ 12.)  Plaintiff cites portions of the record that would place the figure anywhere from "more than 50" to "more than 60."  Because the difference between 52 and the range cited by Plaintiff is not material, the Court assumes that approximately 52 applications were received.

[4]       Testimony and documentation indicates that two of the interviewed applicants, Farnum and Jeffers, submitted sample course outlines with their application materials.  (Morgan Aff. Ex. M; Franke Dep. 53:16-54:11, 138:5-15, 168:11-169:6, 190:21-191:6, Nov. 22, 2005 [hereinafter "Franke Dep. II"].)  Although Franke recalled that Farnum submitted 2 or 3 course outlines, he could not account for their current whereabouts and was not sure why they were not in the materials submitted to Plaintiff.  (Franke Dep. II 53:16-54:11, 138:5-15, 168:11-169:6, 190:21-191:6.)  Plaintiff appears to dispute this fact because the syllabi were not provided to him in discovery and are presumed lost.  (Pl.'s Br. Opp. Summ. J. ("Pl.'s Br.") 8, 10, 18-20; Pl.'s R. 56.1 Stmt. 14.)  The Court finds that this dispute is not material, but will evaluate Farnum's application without reference to the inclusion of course outlines.

Pennsylvania and that she previously taught Introduction to Physical Anthropology Laboratory for three semesters at the University of Missouri, where she also helped to develop new teaching resources utilizing the internet.  (*Id.*)  Farnum's cover letter and CV also pointed out that she had won the Donald K. Anderson Graduate Student Teaching Award from the University of Missouri's Anthropology Department.  (*Id.*)  Farnum's materials indicated that she would be receiving her Ph.D. in Anthropology in May 2002 from the University of Missouri at Columbia. (*Id.*)  Farnum's cover letter indicated that her research focused on prehistoric and modern diet and health in Latin America, the Caribbean and the United States.  (*Id.*)  She stated that she was a co-organizer of a session on ecological adaptation at the 1999 American Anthropological Association Meeting.  (*Id.*)  Her CV indicated that her dissertation was on the Biological Consequences of Social Inequalities in Prehistoric Peru; that she had been the recipient of three funding grants; and that she had made twenty-three presentations between 1994 and 2001 on issues ranging from bioarchaeology and dietary analyses and the health of humans in relation to environmental and social factors.  (*Id.*)  Under publications, her CV listed three articles.  (*Id.*) One article was published in 1995, a second was in press as of 2000, and a third had been accepted for publication as of 2001.  (*Id.*)

Teresa Leslie's application indicated that she was an adjunct professor at the College of New Rochelle during the 2000-2001 academic year.  (Morgan Aff. Ex. N.)  Her cover letter indicated that she had passed her dissertation defense with distinction on September 7, 2001 and would officially graduate from the University of Massachusetts-Amherst with her Ph.D. in February 2002.  (*Id.*)  Leslie's CV identifies her areas of expertise as Bio-Cultural Anthropology, Medical Anthropology, Statistics, Nutrition and Health, Race and Ethnicity, Skeletal Biology,

and Dental Anthropology.  (Morgan Aff. Ex. N.)  Her materials indicated that she had presented papers and organized sessions at numerous professional meetings, and had been awarded a grant from the Centers for Disease Control and Prevention/National Center for Health Statistics for her dissertation research.  (*Id.*)  Leslie stated that her research focuses on contemporary disparities in health patterns and care and that in the past, her research focused on African Americans and how a history of marginalization and oppression often causes disparities in health.  (*Id.*)  Her CV lists one publication in 1992.  (*Id.*)

Sheila Jeffers' application indicated that she was a full-time Assistant Professor at Florida A&M University.  (Morgan Aff. Ex. O.)  Her cover letter stated that she would complete the requirements for her Ph.D. in Anthropology by March 2002 and would have the degree conferred in May 2002.  (*Id.*)  Franke testified that he contacted Jeffers' advisor before inviting her for an interview and confirmed that Jeffers was on the verge of receiving her Ph.D. degree.  (Franke Dep. II 26:19-27:18.)  Jeffers noted that her Ph.D. involved a focus on medical anthropology, and that her dissertation focused on the political economy of health.  (*Id.*)  Jeffers further indicated that she had authored a $129,000 grant for her dissertation research, which was awarded by the Susan G. Komen Foundation, and that she had also received a grant award of $5,000 from the University of Florida.  (*Id.*)  Jeffers stated that she had been recognized by the Susan G. Komen Breast Cancer Foundation for outstanding work in the field of breast cancer research.  (*Id.*)  Jeffers indicated that she conducted her dissertation research at the University of Florida's Anthropology Department/Center for Research on Women's Health and that her research focused on identifying communication barriers between African American women and their providers.  (*Id.*)  Jeffers' CV indicates that she is a member of several organizations, including the Susan G.

6

Komen Breast Cancer Foundation and the African American Advisory Board for the American

Cancer Society. (*Id.*) Under publications, Jeffers' CV listed abstracts, but no actual academic

articles. (*Id.*) Jeffers' application also included a course syllabus for a medical anthropology

class entitled "Culture and Medicine." (*Id.*)

  Plaintiff's application materials consisted of a cover letter, CV, a list of references, and

copies of selected publications. (Morgan Aff. Ex. V.) In his cover letter, Plaintiff also offered to

send reprints of specific articles, a list of all courses taught, a list of fellowships and grants

awarded, and examples of his written proposals, if requested by MSU. (*Id.*) Plaintiff's CV

indicated that he had earned his Ph.D. in Physical Anthropology in 1985, and that since 1985 he

had been employed as a Research Associate in the Department of Mammalogy at the American

Museum of National History. (*Id.*) According to Plaintiff, the position of Research Associate is

an unpaid position meant to facilitate an individual's research. (Sarmiento Dep. 68:4-80:18,

Nov. 22, 2005 [hereinafter "Sarmiento Dep."]; Pl.'s Resp. to Def.'s Rule 56.1 Stmt. ¶ 46.)

According to Plaintiff's CV, his most recent university teaching experience was in 1997, when

he was an Adjunct Associate Professor in the Biology Department at York College of the City

University of New York. (Morgan Aff. Ex. V.) His last teaching experience in a university

anthropology department was at Rutgers University in 1988. (*Id.*) Plaintiff's cover letter stated

"[m]ost of my research has centered on great apes." (*Id.*) The letter then described Plaintiff's

current work "on the relationships between morphology, ecology, and behavior in chimpanzees

and gorillas from a number of forests throughout Uganda, DRC, Sudan and Angola," stating that

he hopes to use these studies to test some of the theoretical interpretations of great ape behavior

presented in his thesis. (*Id.*) The cover letter stated that Plaintiff has seventeen years of

university teaching experience and that he has taught a full range of introductory and upper level courses in biological anthropology.  (*Id.*)  Plaintiff then described in detail the courses he taught in medical schools in Uganda and South Africa — "basic medical sciences (gross anatomy, histology, embryology, neuro-sciences physiology)."  (*Id.*)  Plaintiff indicated that he helped to run a master's program in surgery, and that the master's theses he supervised "were aimed mainly at arriving at practical solutions to third world surgical/medical problems."  (*Id.*)  Plaintiff's CV listed over thirty publications that were published or in press.  (*Id.*)

After receiving notification on March 26, 2002 that he had not been selected for an interview and that the position had been filled, Plaintiff contacted Franke by phone and by e-mail, asking Franke to share what type of experience or specialization MSU was looking for in the individuals who were interviewed.  (Sarmiento Aff. Exs. 18, 26.)  In an April 10, 2002 e-mail to Plaintiff, Franke indicated that he had reviewed Plaintiff's submission again, and stated that Plaintiff's "credentials were outstanding" and that Plaintiff had been "ranked very highly."  (*Id.*)  Franke wrote that Plaintiff's presentation of materials was fine, and that he did not see any obvious way Plaintiff could improve upon it.  (*Id.*)  Franke noted that more than 50 candidates applied for the position, several of whom "were of exceptionally high quality" like the Plaintiff, and that other candidates had been ranked above him.  (*Id.*)

On July 18, 2002, Plaintiff filed a complaint with the EEOC, alleging discrimination based on his age, sex and national origin.  (Morgan Aff. Ex. S; Sarmiento Aff. Ex. 28.)  Plaintiff claimed that his own qualifications and experience most closely matched the needs listed in the job advertisement, and alleged numerous deficiencies in Farnum's qualifications, including that Farnum had yet to complete her Ph.D. degree, had very little teaching experience, and had limited writing experience.  (Morgan Aff. Ex. S; Sarmiento Aff. Ex. 28; Compl. ¶ 6; Def.'s Rule

56.1 Stmt. ¶ 39; Pl.'s Resp. to Def.'s R. 56.1 Stmt. ¶ 40; Pl.'s R. 56.1 Stmt. at 18.)  The EEOC issued a determination letter on May 22, 2003, stating that Plaintiff was "far more qualified" than Farnum for the position, and concluding that MSU's stated reasons for hiring Farnum instead of Plaintiff did not withstand scrutiny.  (Sarmiento Aff. Ex. 32.)  MSU filed a letter with the EEOC requesting reconsideration, which was denied.  (Sarmiento Aff. Exs. 33, 34.)  MSU refused conciliation, and the EEOC subsequently issued a right-to-sue letter on June 1, 2004.  (Sarmiento Aff. Exs. 35, 36; Compl. ¶ 7; Def.'s Rule 56.1 Stmt. ¶ 41; Sarmiento Aff. Ex. 37.)

Plaintiff filed the instant action on August 24, 2004 pursuant to Title VII, § 1981, the Age Discrimination in Employment Act ("ADEA"), and the New Jersey Law Against Discrimination ("NJLAD").  In November 2004, Defendant moved for partial dismissal of the Complaint, seeking to dismiss the § 1981, ADEA and NJLAD claims based on sovereign immunity.  This Court granted the Defendant's motion on March 31, 2005.  The only count remaining, therefore, is Plaintiff's claim of race, color and national origin discrimination in violation of Title VII.  Defendant's Motion for Summary Judgment is presently before the Court.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Equimark Commercial Financial Co. v. CIT Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).  In opposing summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; rather, only disputes over facts that might affect the outcome of the lawsuit, under the

governing substantive law, will preclude the entry of summary judgment.  *Anderson*, 477 U.S. at

247-48.  At the summary judgment stage, this Court must view all evidence and consider all

reasonable inferences in a light most favorable to the non-moving party.  *Marzano v. Computer

Science Corp.*, 91 F.3d 497, 501 (3d Cir. 1996).

## DISCUSSION

Because Plaintiff has not put forth any direct evidence of discrimination, the Court must

analyze his Title VII claims under the burden-shifting framework announced in *McDonnell

Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Under *McDonnell Douglas*, Plaintiff

bears the initial burden to establish a *prima facie* case of unlawful discrimination by showing (1)

that he is a member of a protected class; (2) that he sought and was qualified for a job for which

the employer was seeking applicants; (3) that despite his qualifications, he was rejected; and (4)

that a non-member of Plaintiff's protected class was treated more favorably.  *See id.* at 802.

If a plaintiff produces sufficient evidence to establish the *prima facie* case, a presumption

of discrimination arises and the burden shifts to the employer to come forward with a legitimate

non-discriminatory reason for the adverse employment decision.  *See Stanziale v. Jargowsky*, 200

F.3d 101, 105 (3d Cir. 2000).

Once the defendant satisfies its "relatively light burden," the plaintiff then has the

opportunity to prove, by a preponderance of the evidence, that the legitimate nondiscriminatory

reason articulated by the defendant was not the true reason for the employment decision but was

merely a pretext for discrimination.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *Jones v.

Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999).  A plaintiff can accomplish this

by pointing to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the defendant's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendant's action. *Fuentes*, 32 F.3d at 764. To discredit the defendant's proffered reasons, however, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. Instead, the plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's proffered reasons "that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

This Court must therefore review the materials submitted by both parties in order to determine first, whether Plaintiff has established a *prima facie* case; second, whether Defendant has proffered a legitimate, race-neutral reason for its decisions; and third, whether Plaintiff has pointed to evidence that would reasonably support a finding that Defendant's proffered reasons were merely a pretext for discrimination.

## I.   PLAINTIFF'S *PRIMA FACIE* CASE

To establish a *prima facie* case of discriminatory failure to hire under Title VII, Plaintiff must show (1) that he is a member of a protected class; (2) that he sought and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications, he was rejected; and (4) that a non-member of Plaintiff's protected class was treated more favorably. *See McDonnell Douglas*, 411 U.S. at 802.

It is undisputed that the Plaintiff is Hispanic;[5] that Defendant rejected his application for the tenure-track position in biological anthropology; and that the position was ultimately offered to a white woman.  Defendant asserts, however, that Plaintiff cannot establish a *prima facie* case of discrimination because he cannot establish that he met the qualifications sought by the PAC. (Def.'s Br. Supp. Summ. J. ("Def.'s Br.") 6.)

There is no hard-and-fast rule covering precisely what a plaintiff must show in order to establish a *prima facie* showing under *McDonnell Douglas*.  *Fasold v. Justice*, 409 F.3d 178, 185 n.10 (3d Cir. 2005).  For purposes of meeting the relatively minimal requirements of a *prima facie* showing, the Court is satisfied that Plaintiff's credentials made him "qualified" for the position at MSU.

## II.   DEFENDANT'S PROFFERED RACE-NEUTRAL BASIS FOR THE HIRING DECISION

Because the Court finds that Plaintiff has established a *prima facie* case, the burden shifts to MSU to come forward with legitimate, non-discriminatory reasons for the decision not to interview or hire Plaintiff.  *See Stanziale*, 200 F.3d at 105.

Defendant MSU asserts that it has established a legitimate, nondiscriminatory basis for its decisions regarding interviews and hiring for the position.  MSU contends that while the PAC acknowledged that Plaintiff met some of the basic qualifications for the position, given that he had obtained his Ph.D. in Physical Anthropology and had previously taught anthropology courses, the committee felt that the research interests and experience of the three finalists were a closer fit with the interests and needs of MSU and the anthropology department.  (Franke Dep. II

---

[5]       Plaintiff did not provide his national origin at the time of application, but was identified on the PAC's list of applicants as having a Hispanic name.  (*See* Sarmiento Aff. Ex. 12; Franke Dep. II 33:21-22.)

127:3-21; Def.'s Reply Br. Supp. Summ. J. ("Def.'s Reply Br.") 2-3; Def.'s Rule 56.1 Stmt. ¶ 45;

Pl.'s Resp. to Def.'s R. 56.1 Stmt. ¶ 45.)  Franke denied that either race or national origin was a

factor in the decision to hire Farnum, or that race or national origin played any role in the

decision not to interview or hire Plaintiff.  (Franke Dep. II 192:11-193:6.)  Franke testified that

the reason no Hispanics were selected for interviews was that "the only identifiable Hispanic

name from the list was a candidate who did not fit the job description very well, and who did not

submit substantial evidence of teaching experience, as did the other three candidates."  (Franke

Dep. I 74:13-21.)

Without attacking the facial sufficiency of Defendant's proffered reasons, Plaintiff asserts

that Defendant's proffered reasons are not actually "legitimate" or "non-discriminatory," arguing

that because his qualifications were so superior to those of the finalists, there can be no

legitimate or non-discriminatory reason for MSU's failure to interview and hire him for the

position.  (Pl.'s Br. 6-9.)  However, at this stage of the *McDonnell Douglas* analysis, a

defendant's burden is one of production, not persuasion; the defendant need only "offer evidence

that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory

reason" for its hiring decision.  *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir.

1997).

The Court concludes that Defendant has met its intermediate burden of articulating a

facially legitimate, nondiscriminatory reason for the decision not to interview or hire Plaintiff.

Plaintiff's claims on this point are equivalent to his third-prong argument that Defendant's

reasons are pretextual, and are addressed in depth below at the third stage of this Court's

*McDonnell Douglas* analysis.

### III.   PRETEXT

Because neither side suggests there is any direct evidence of discrimination, this case turns on whether Plaintiff has adduced evidence of pretext such that a reasonable factfinder could decide in his favor on his allegations that he was not hired because of his race or national origin. At this stage, Plaintiff must show, by a preponderance of the evidence, that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination.  *Fuentes*, 32 F.3d at 763; *Jones*, 198 F.3d at 410-11.

The Third Circuit has recognized two ways of demonstrating pretext.  A plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." *Fuentes*, 32 F.3d at 762.  Alternatively, a plaintiff can present evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Id.*  The Third Circuit instructs, however, that "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'"  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765).  Instead, a plaintiff "must 'present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.'"  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Kautz*, 412 F.3d at 467).  To succeed, Plaintiff must present evidence that suggests "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  *Keller*, 130 F.3d at 1109.  This rigorous standard is placed on a

14

plaintiff because "federal courts are not arbitral boards ruling on the strength of [the employment decision].  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."  *Id.* (citing *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

Determining pretext is a fact-based inquiry.  *Kautz*, 412 F.3d at 468.  The relevant, case-by-case inquiry is whether the employer's lack of credibility as to some of the proffered reasons so seriously undermines its credibility that a factfinder could reasonably disbelieve all of the employer's proffered reasons.  *Stanziale*, 200 F.3d at 106.  Plaintiff's primary argument in defense of summary judgment is that the discrepancy between his credentials and those of the three finalists is so great that it can bear the entire burden of allowing this Court to find that a reasonable trier of fact to conclude that MSU's explanations are pretextual.[6]  (Pl.'s Br. 2, 7-9.) Plaintiff also puts forth several specific challenges to MSU's intent and credibility, which he

---

[6]      In support of his argument that his credentials are superior, Plaintiff relies heavily on a document purporting to be an expert report.  (*See* Sarmiento Aff. Ex. 20.)  In the report, Columbia University professor Ralph Holloway evaluates Dr. Sarmiento's qualifications relative to those of the other applicants, and concludes that "there is no clear objective reason" why Plaintiff was not brought in to interview, why he was not ranked above the three finalists, and why he was not offered the position.  (*See id.* at 7.)  Rule 56(e) of the Federal Rules of Civil Procedure requires, in relevant part, that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Holloway's report fails to meet these requirements.  First, the report is unsworn, and is not even in the form of an affidavit.  Second, neither Plaintiff's affidavit nor Holloway's report gives any indication that Holloway is competent to render an opinion on the matters discussed in the report.  Holloway merely identifies himself as a Professor in the Department of Anthropology at Columbia University, and notes that his opinions are rendered "[b]ased upon [his] expertise," without any further information about his relevant experience or qualifications.  (*See id.* at 1, 7.) Therefore, even if the Court were inclined to find Holloway's conclusions relevant, the Court finds that Holloway's report fails to comply with the requirements of Fed. R. Civ. P. 56(e) and is not competent evidence to be considered in deciding this motion for summary judgment.  *See Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989).

argues could combine with the evidence of his superior qualifications to cast doubt on MSU's proffered hiring rationale and provide a basis for a jury to find that MSU's actions were motivated by unlawful discrimination.  (Pl.'s Br. 2, 9-21.)  The Court will address each of Plaintiff's arguments in turn.

> ### A.      The Relative Credentials of the Candidates

Plaintiff contends that because he met or exceeded all of the criteria listed in the position announcements and screening instrument, whereas the finalists failed to meet some of the basic requirements, no reasonable trier of fact in the exercise of impartial judgment could have chosen the selected finalists for the position over the Plaintiff.  (Pl.'s Br. 9.)

As discussed above, Defendant has acknowledged that Plaintiff met some of the basic qualifications for the position, and that his qualifications were in some respects superior to those of the successful applicants.  (Def.'s Reply Br. 2-3; Def.'s Rule 56.1 Stmt. ¶ 45; Pl.'s Resp. to Def.'s R. 56.1 Stmt. ¶ 45.)  However, Defendant has repeatedly and consistently emphasized that Plaintiff was not selected for an interview because the Committee felt that his application portrayed him as a highly specialized researcher whose area of specialization was not as appropriate to the needs of MSU and its students as those of the successful finalists.

As another district court held in a very similar case brought by this Plaintiff against the City University of New York, "[i]f Defendant reasonably believed, based on the materials submitted by Plaintiff in his job application, that Plaintiff's work did not focus on the specialty they sought, and based their hiring decision on this objective and race-neutral criteria, their decision is not actionable under Title VII, even if it is later determined that their assessment of Plaintiff's work was inaccurate."  *Sarmiento v. Queens College CUNY*, 386 F. Supp. 2d 93, 112 (E.D.N.Y. 2005), *aff'd*, 153 Fed. Appx. 21 (2d Cir. 2005).  Therefore, if the Committee's

16

assessment of Plaintiff's credentials was reasonable, and the basis for its decision race-neutral, Plaintiff cannot obtain relief under Title VII merely by showing that the Committee's assessment was ultimately inaccurate.  As the Court will explore below, abundant, uncontroverted testimony on the record in this case supports and expands upon the basis for the Committee's conclusion that Plaintiff's area of specialization was less appropriate for the position than the finalists'.

### 1.     The Candidates' Research Interests and Areas of Specialization

Franke testified that the three finalists were selected over the Plaintiff because "the interests and areas that they were working in showed us that they were working in the areas that fit more closely with our interests and needs."  (*Id.* 127:18-21.)   Specifically, Franke testified that the Committee was looking for a candidate who understood the relationship between human society and disease patterns.  (*Id.* 113:7-20, 133:4-137:14.)  Franke testified that each of the three finalists presented evidence in their application materials of research and teaching interests in that particular area of medical anthropology.  (*Id.* 136:21-137:14.)  Substantial evidence supports Franke's testimony on this point.  At the time of application, Julie Farnum was teaching four courses at Indiana University of Pennsylvania, including a course in Introduction to Physical Anthropology, and her cover letter contained a detailed description of her work in medical anthropology, specifically as it related to health and social inequalities.  (Morgan Aff. Ex. M.) Teresa Leslie had been teaching as an adjunct professor at the College of New Rochelle as recently as the spring semester of 2001, and her cover letter and CV described her research on the relationship of race to disparities in health patterns and care.  (Morgan Aff. Ex. N.)  Sheila Jeffers was working as an assistant professor at Florida A&M University, and her cover letter and CV described her dissertation's focus on the political economy of health and her award-winning work in the field of breast cancer research.  (Morgan Aff. Ex. O.)

In contrast, Franke testified that Plaintiff's application materials gave the impression that he was "not focused on the relationship between human society and culture and patterns of health and disease." (Franke Dep. II 152:6-20.) For example, Franke felt that Plaintiff's application portrayed him as very specialized in surgery and anatomy, and that his application letter gave the impression that his main areas of medical expertise were in those areas, which were not the areas of medicine that medical anthropology focuses on according to the way MSU's department wanted to have it taught. (*Id.* 105:22-106:3, 128:7-129:15, 152:6-10, 103:22-111:2.) Franke testified that Plaintiff's cover letter "convinced the committee that [Plaintiff was] primarily involved in the anatomical sort of technical surgical/medical side, rather than what we understand as Medical Anthropology, which is more the relationship between culture and disease patterns." (*Id.* 85:21-88:9.) Indeed, Plaintiff's cover letter describes in detail the courses he taught in medical schools in Uganda and South Africa — "basic medical sciences (gross anatomy, histology, embryology, neuro-sciences physiology)" — and indicates that he helped to run a master's program in surgery, and that the master's theses he supervised "were aimed mainly at arriving at practical solutions to third world surgical/medical problems." (Morgan Aff. Ex. V.) Franke testified that when a candidate presents materials to an anthropology department, "as opposed to a committee of MDs or anatomists," the candidate has to show "some knowledge of the relation between human culture and human society. You can't just put the word anatomy in and assume that we will derive all of that information from that word." (Franke Dep. II 133:4-11.)

Defendant also asserts that Plaintiff's CV and cover letter suggested that his area of specialization, or at least a very substantial portion of his research, is on the study of primates, while the other candidates' applications focused almost exclusively on human populations.

(Def's Br. at 7; Def's Reply Br. at 4.)  Notably, the first substantive paragraph of Plaintiff's cover letter begins with the sentence "[m]ost of my research has centered on great apes," then goes on to describe Plaintiff's current work with chimpanzees and gorillas.  (Morgan Aff. Ex. V.)

Franke testified that the department's interests were reflected in the position announcements in the references to a desired focus on Applied Anthropology and to the expectation that a candidate would "develop new courses appropriate to the needs of the department in the area of specialization."  (Franke Dep. II 68:19-72:8, 151:19-152:2.)  Franke testified that the Committee "spent a lot of time thinking through and looking at what people published about," and "tried to make the best assessment we could of the quality of their publications, based both on the names of the journals or the publishers of the books."  (*Id.* 151:3-8.)  But the Committee also took into account the candidates' "fit with the pedagogical needs of the University" and the kinds of programs that MSU is trying to develop.  (*Id.* 151:8-13.)  Franke testified that the nature of MSU's teaching mission and student needs would have been apparent to any serious candidate who visited MSU's website or made any investigation of the nature of Montclair State before applying.  (*Id.* 68:14-71:8, 166:16-25.)

Additionally, Plaintiff argues that Farnum's area of expertise is best characterized as archaeology rather than anthropology, and that because his degree and experience are in physical anthropology, he was a closer fit for the position than Farnum.  (Pl.'s Br. 8-9.)  Franke noted that the PAC did not view Farnum's expertise as limited to archaeology, but as representing a broad approach to biological anthropology that was in line with the needs of MSU's students.  (Franke Dep. II 39:8-40:5, 159:1-161:16; Sarmiento Aff. Ex. 30 at 3.)  Overall, Franke stated that Farnum was a closer fit to the job description because she gave clear evidence of being able to organize the particular course the department wanted her to teach, and because she had a broad perspective

on medical anthropology.  (Sarmiento Aff. Ex. 5 at 3.)  At the time of her application Farnum was, in fact, presently teaching Introduction to Physical Anthropology, the very course which was prominently specified in MSU's advertisements for the position.  (Morgan Aff. Exs. A, B, M.)

The issue was not that Plaintiff's experience was totally unrelated to the position, Franke testified, but that "the other candidates presented areas of research interests that fit more with the interests of the department and the direction we wanted to go in educating our students."  (Franke Dep. II 68:7-18.)  Franke testified that the other finalists' applications gave a clearer indication that their experience was appropriate for the courses and students at MSU, where students are interested in exploring the less technical topics within Human Variation, such as the relationship between human society and disease patterns and racial differences and the causes of racial variation.  (*Id.* 127:6-137:14, 175:25-177:10.)  Franke emphasized that the MSU Anthropology Department was not geared towards preparing its students for medical school; rather, the department wanted its courses to focus on the relationships between human social and cultural factors and medical disease and health issues, because that is the type of training which helps MSU students find jobs.  (Franke Dep. II 113:7-20, 128:7-19, 134:12-13, 161:7-16.)

### 2.     *The Candidates' Fit With the Job Description*

Plaintiff does not put forth evidence contradicting the Committee's conclusions regarding academic fit and departmental needs, but merely argues that the Committee could not have legitimately reached such conclusions in light of the disparity between his credentials and those of the finalists.  As discussed below, the Court cannot agree.

### a.     *Ph.D. Requirement*

Plaintiff argues that he was more qualified for the position because he had earned his Ph.D. in 1985.  He contends that Farnum and Jeffers did not meet the basic requirements for the

20

position because they had not yet earned their Ph.D.s, and suggests that MSU relaxed or deviated

from its standards by hiring Farnum before her Ph.D. was conferred.  (Pl.'s Br. 8-10, 14-15.)

However, uncontroverted evidence establishes that according to departmental policy, if it appears

to the committee that a candidate will attain a required degree prior to the start date of the

position, a candidate is considered qualified.  (Sarmiento Aff. Ex. 5 at 3; Lynde Dep. 18:22-

19:13, Sept. 7, 2005 (Sarmiento Aff. Ex. 1).)  As part of its assessment of Farnum's degree

status, Franke testified, the Committee required her to provide a transcript and completed

chapters of her Ph.D. thesis.[7]  (Pl.'s Br. 10; Franke Dep. II 58:11-17, 191:3-6; Sarmiento Aff. Ex.

5 at 3.)  Dr. Richard Lynde, MSU's Provost and Vice President for Academic Affairs, further

testified that MSU considers the degree to have been attained when all requirements have been

met, rather than focusing on the actual conferral date of the degree.  (Lynde Dep. 8:20-9:24.)

This testimony is in accord with Farnum's letter of appointment, which indicates that her offer is

contingent upon the submission of evidence to the Provost by September 1, 2002 that she has

completed all requirements for her doctoral degree.  (Sarmiento Aff. Ex. 38.)  It is also in accord

with an e-mail which Lynde apparently sent to Plaintiff regarding the university's general policy

towards Ph.D. requirements.  (Sarmiento Aff. Ex. 27.)  Franke also testified that before inviting

Jeffers for an interview, he telephoned Jeffers' advisor to inquire about the status of her degree

and was told that Jeffers was within a few weeks of completing her Ph.D.  (Franke Dep. II 26:19-

27:18.)  Under these circumstances, neither the fact that Farnum and Jeffers had not earned their

Ph.D.s at the time of application, nor Plaintiff's assertion that Farnum's degree was not actually

---

[7]      Plaintiff points out that these documents are presumably lost; they apparently
were not retained by the Committee, and thus were not provided to him in discovery.  (Pl.'s Br.
21-22.)  However, he does not challenge the fact that the Committee did request these additional
materials from Farnum.  (Pl.'s Br. 10.)

conferred until December 2002, casts doubt on MSU's characterization of its hiring decisions in this case.

> b.    *Publications*

Plaintiff's CV lists more publications than Farnum's or the other finalists'.  (Morgan Aff. Ex. V.)  Franke stated in his interview with the EEOC that Farnum did not have an illustrious publication list, so would have been rated lower than Plaintiff on that criteria.  (Sarmiento Aff. Ex. 5 at 3.)  However, Franke stated that Farnum was nonetheless rated higher than Plaintiff overall.  (*Id.*)  The Committee was more concerned with the areas of research interests presented by the candidates than with the absolute number of publications each presented.  (*See* Franke Dep. I 96:12-97:23; Franke Dep. II 58:11-71:23.)  Franke testified that the Committee perceived Plaintiff's research as involving "arcane primatology," and the titles of his publications "suggested a range of interests on the fringes of where our department wanted to go and where we wanted to take our students."  (Franke Dep. II 66:19-68:18, 136:21-23, 148:20-23; *see also* Sarmiento Aff. Ex. 30 at 2, 4.)

> c.    *Grant-Writing Experience*

The Committee recognized that Plaintiff had more grant-writing experience than Farnum, but noted that Farnum had also received funding for three research grants, and that the position announcement called only for candidates to have the *potential or* demonstrated ability to write grant applications.  (Sarmiento Aff. Ex. 30 at 3-4.)  Moreover, the disparity between the number of grants earned by Plaintiff and those earned by the other finalists was not made evident in Plaintiff's application materials.  (*See* Morgan Aff. Ex. V.)  Rather than providing a list of grants and funding in his CV or cover letter, as Farnum and the other finalists did, Plaintiff offered to provide a list upon request and expected the Committee to find evidence of the grants he had

22

received by reading the "acknowledgements" sections of the publications he submitted.  (Morgan Aff. Ex. V; Sarmiento Dep. 148:9-154:14.)

*d.     Teaching Experience*

Finally, while Plaintiff's cover letter stated he had seventeen years of teaching experience, which is more experience than the successful applicants had, Plaintiff fails to point to evidence contradicting Defendant's reasons for discounting Plaintiff's teaching experience. Specifically, Franke noted that it appeared from Plaintiff's CV that he had not taught an undergraduate course in Anthropology since 1988, and that his application showed less of an ability to teach Applied Anthropology courses than the interviewed candidates.  (Franke Dep. II 70:19-25, 178:16-182:24; Pl.'s Resp. to Def's R. 56.1 Stmt. ¶ 47.)  Franke also noted the Committee's concern that Plaintiff's "areas of expertise tended to be on the technical side," and that Plaintiff's research areas were considered less appropriate to the department than those of the other candidates.  (Franke Dep. II 85:21-87:11, 71:21-23, 103:22-104:21.)  Franke testified that compared with the selected candidates, Plaintiff's application was simply not as close to the teaching mission of MSU, which at the time was not a research-oriented university but placed great emphasis on teaching.  (*Id.* 127:3-129:15, 103:22-113:20, 131:16-137:14, 166:18-23.) Franke testified that the Committee viewed Plaintiff's application as a package, and concluded that the overall fit between Plaintiff's areas of expertise as exemplified in his publications and cover letter "were less consistent with the teaching needs and the needs of our students than those of the candidates we chose to interview."  (*Id.* 175:25-177:4.)  In addition, although Plaintiff had experience teaching master's level courses, while the other finalists did not, MSU emphasized that Plaintiff's experience teaching master's courses *to surgeons* was not as relevant to the needs of MSU students as the undergraduate teaching experience of the other finalists.  (*Id.* 86:5-15.)

23

Franke testified that it was not required that the applicants have already taught the specified courses prior to being hired, nor were applicants required to have already taught graduate or master's level courses.  (*Id.* 6:25-7:3, 16:4-11, 18:13-17, 24:4-26:4, 16:4-11, 25:21-24.)  Indeed, Plaintiff does not dispute that the position announcement indicates that candidates should "be prepared to" teach such courses, rather than that they have already done so.  (Morgan Aff. Ex. B; Def.'s R. 56.1 Stmt. ¶ 8; Pl.'s Resp. to Def.'s R. 56.1 Stmt. ¶ 8.)  Finally, Farnum's application indicated that she had won a teaching award from the University of Missouri Anthropology Department, whereas Plaintiff's application materials gave no indication that he had received any such awards for teaching.  (Morgan Aff. Exs. M, V; Franke Dep. II 165:13-14.)

### 3.      MSU's Application of the Selection Criteria

In evaluating applications for closeness of fit to the position description, Franke testified, the Committee did not apply the listed criteria as a checklist to eliminate applicants; rather, the Committee viewed individuals' qualifications as a package.  (Franke Dep. I 97:18-23; Franke Dep. II 175:25-176:10.)  Weaknesses in one category were in some cases compensated for by strengths in another.  (Franke Dep. II 9:20-10:1.)  Franke further testified that beyond the basic criteria listed in the position announcements, the PAC made academic judgments about the qualifications and fit of each candidate in deciding whom to interview and hire.  (Franke Dep. II 70:3-71:23, 85:21-88:9, 93:1-11, 103:22-111:20,107-08, 148:20-23, 151:3-153:10, 175:25-178:15.)  Individuals looking for jobs in the academic world, Franke testified, should understand that a list of qualifications and expectations in a position announcement "doesn't mean that you have to have absolutely every one of the criteria met to the exact letter."[8]  (Franke Dep. I, 97:8-

---

[8]      Plaintiff points to an alleged inconsistency in the record, pointing out that while Franke in his deposition emphasized fit with the department and the university as an important

23.)  Rather, the position announcement lists the type of general qualifications sought by the

department, "after which the search committee attempts to identify candidates who will best

fulfill the mission of the University in terms of the teaching and research that we wanted done."

(Franke Dep. II 104:16-21.)

Plaintiff claims that this approach resulted in the inconsistent application of the screening

instrument by the Committee.  However, absent some evidence tending to show that the

Committee's departures from the baseline criteria were inappropriate or irrational, such

departures do not support an inference of pretext.  *See Williams v. Rohm & Haas Co.*, 90 Fed.

Appx. 627, 629 (3d Cir. 2004).  "In the context of a discriminatory failure to hire case, the

existence of baseline requirements does not preclude an employer from considering additional,

legitimate qualifications and then deciding who is most capable of performing the job.  It is not

the court's role to second-guess an employer's business judgment as to who is more qualified for

the job."  *Dungee v. Northeast Foods*, 940 F. Supp. 682, 689 (D.N.J. 1996).  The importance of

---

criteria, Franke had been asked to describe the "preferred qualifications" for the position in his
EEOC interview, and responded "[n]othing that was not on the position description."  (Sarmiento
Aff. Ex. 5 at 2; Pl.'s Br. 14.)  There is no inconsistency.  Asked at deposition whether he agreed
with his prior statement, Franke answered yes, and then went on to explain the role that academic
judgment plays in evaluating applicants' credentials and fit with the listed criteria.  (Franke Dep.
II 91:9-93:10.)  Franke's testimony is replete with detailed explanations of why the preferred
qualifications listed in the position announcement cannot be applied as a checklist to select and
eliminate applicants in an academic setting. (Franke Dep. I 97:18-23; Franke Dep. II 70:3-71:23,
85:21-88:9, 93:1-11, 103:22-111:20,107-08, 148:20-23, 151:3-153:10, 175:25-178:15.)
Plaintiff's brief misquotes and mischaracterizes the record testimony when he argues that "a job
description that as testified to by Franke is tailored to hide **all** of the real qualifications for the
position under a veil of secrecy contravenes civil rights legislation and is illegal."  In the portion
of the deposition to which Plaintiff refers, Franke testified — explaining why applicants'
credentials were considered in light of MSU's academic and pedagogical needs, and why those
needs were not itemized in the position description like the other qualifications — that "it's
standard academic practice that when people apply for a job they should fit with the mission and
needs of the university that they propose to teach in."  (Franke Dep. II 104:22-105:15.)

deference to professional judgment in academic settings is particularly well-established. *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.").

Ultimately, Plaintiff's dissection of the finalists' applications reflects only his own *post-hoc*, subjective evaluation of their credentials relative to his own. Plaintiff does not actually dispute the qualifications of the finalists and the successful candidate; instead, his arguments boil down to a disagreement with how the Committee should have viewed and evaluated their applications versus his own. However, "Plaintiff's subjective belief that he was more qualified for the job does not create an issue of fact for the jury." *Dungee*, 940 F. Supp. at 689. The Court's role is to determine whether MSU's decision was rational and non-discriminatory. It is not the function of this Court to second-guess hiring decisions concerning the relative qualifications of competing applicants and subjectively weigh factors that the Plaintiff or the Court considers important. *See Keller*, 130 F.3d at 1109; *Dunleavy v. Montville Twp.*, 2005 U.S. Dist. LEXIS 17040 (D.N.J. 2005), *aff'd*, 192 Fed. Appx. 100 (3d Cir. 2006).

In light of the substantial record support for MSU's conclusion that the three finalists' research interests and areas of specialization were more appropriate to the needs of MSU than Plaintiff's, Plaintiff's efforts to establish that he was qualified for the assistant professor position and to denigrate the other applicants' credentials do not undermine Defendant's contention that its proffered non-discriminatory rationale was actually its honest motive in selecting the three interviewed candidates and ultimately hiring Farnum. Having reviewed the relative

26

qualifications of Plaintiff and the three finalists against MSU's proffered non-discriminatory rationale for its hiring decisions, the Court finds that Plaintiff has not "'present[ed] evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.'" *Tomasso*, 445 F.3d at 706 (quoting *Kautz*, 412 F.3d at 467.)

In sum, under the circumstances of this case, the Court cannot conclude that Plaintiff's qualifications were so overwhelming that no rational factfinder could have failed to interview and hire him above the three finalists. *See McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) (noting that a court does not function as a "super-personnel department" that reexamines an entity's business decisions). Plaintiff has not established that the strength of his credentials alone could serve as the basis for a finding that MSU's decision was "so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109.

### B.    Different Standards

Plaintiff points out that the PAC asked the finalists to submit additional materials to clarify some of their qualifications, but did not ask Plaintiff to submit anything, and argues that his application was therefore held to a different standard than the finalists' applications. (Pl.'s Br. 9-10.) Plaintiff argues that "[b]y sending additional material plaintiff could have easily clarified any questions the hiring committee may have had considering his application." However, the PAC requested additional information and materials from *only* the three finalists, at the point that they were chosen as finalists. (Franke Dep. II 189:17-191:6.) Thus, Plaintiff's argument on this point is merely a restatement of his central claim, already discussed at length and rejected by this Court, that his qualifications were so superior that he should have been hired or at least short-listed for the position.

Plaintiff also argues that his work experience and publication record were held to a different standard, citing (1) the Committee's mistaken perception that he had not taught anthropology since 1988, since the Committee failed to infer the fact, not specified on his CV, that his teaching positions in anatomy departments outside of the U.S. in fact involved teaching anthropology, and (2) the Committee's improper subjective assumptions as to the contents of the candidates' publications based only on their titles, which led to Franke's impression of Plaintiff's work as focusing on "arcane primatology."  (Pl.'s Br. 11-12; Franke Dep. II 66:19-68:18, 136:21-23, 148:20-23.)  As the Court has already discussed, *see supra* Part III.A.1, the Committee's impression of Plaintiff's experience and publications was reasonably based on Plaintiff's own application materials, which did not identify any anthropology courses taught after 1988; which stated "[m]ost of my research centers on great apes" and discussed his current work with chimpanzees and gorillas; and which included a list of publications on which the words "gorilla" and "primate" appear frequently.  (*See* Morgan Aff. Ex. V.)

Plaintiff contends that the Committee's subjective evaluation process consistently placed a positive spin on Farnum's credentials and a negative spin on his own, and argues that this could give rise to an inference of discrimination.  (Pl.'s Br. 11-12.)  Under the circumstances presented here, however, the Court finds that Plaintiff is once again merely restating his own subjective belief that he was more qualified for the position and that his application was not properly evaluated by the Committee.  Once again, the issue before this Court is whether MSU's decision was motivated by discriminatory animus, not whether it was "wise, shrewd, prudent, or competent."  *Fuentes*, 32 F.3d at 765.  The use of subjective criteria alone does not establish pretext; a plaintiff must identify some other evidence from which a reasonable juror could consider the subjective criteria to be a mask for discrimination.  *Williams*, 90 Fed. Appx. at 629.

28

C.     **The EEOC's Determination of Discrimination**.

Plaintiff asserts that summary judgment cannot be granted because the EEOC, a

reasonable trier of facts, concluded that MSU's proffered non-discriminatory reasons did not

withstand scrutiny.  (Pl.'s Br. 21; Sarmiento Aff. Ex. 32.)  The admissibility of an EEOC

determination letter is a matter within the sound discretion of this Court, and is determined on a

case-by-case basis.  *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1099 n.12 (3d Cir.

1995).  If the Court finds that an EEOC determination is not supported by the record, it is not

competent evidence.  *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1341-42 (3d Cir. 2002)

(holding that an agency determination that is not "trustworthy" is inadmissible).  Under the facts

of this case, the Court finds that the EEOC determination letter is not competent evidence to be

considered on this summary judgment motion, for the following reasons.

First, the letter discusses Plaintiff's allegations of discrimination on the basis of national

origin, gender and age, whereas the only claim remaining in this Court relates to national origin.

(Sarmiento Aff. Ex. 32 at 1.)  The report's general finding that "the evidence obtained during the

investigation establishes a violation of the statute," therefore, is insufficiently specific as to the

particular type of violation or violations found, or whether a particular basis exists for a finding

of discrimination based on national origin.  (*See id.* at 2.)  Second, and more significantly, the

only evidence cited in the letter, and thus the only apparent basis for the EEOC's determination,

is the EEOC's independent and subjective analysis of Plaintiff's and Farnum's application

materials against the criteria stated in the position announcement.  (*Id.*)  The EEOC's vague

conclusions that Plaintiff "is well qualified" and Farnum "lacks certain requirements" with

respect to the position announcement are therefore insufficient to support its determination that

Plaintiff "is far more qualified for the position than the successful candidate," a conclusion that

this Court has already considered at length and rejected as unsupported by the record.  (*See supra* Part III.A.)

Therefore, to the extent that Plaintiff seeks to rely on the EEOC determination letter as evidence from which a reasonable factfinder could find evidence of discrimination or pretext, the Court finds that the EEOC's determination is not sufficiently trustworthy to be considered as competent evidence.

**D.    MSU's Overall Credibility**

Plaintiff also puts forth several arguments as part of a general challenge to MSU's credibility.  The Court will consider each in turn.

### 1.    *Withholding Information from the EEOC*

Plaintiff alleges that inconsistencies between MSU's deposition testimony in this matter and MSU's reports to the EEOC during its investigation show that MSU appears to have lied to or withheld information from the EEOC, and that the Court should therefore doubt MSU's overall credibility.  (Pl.'s Br. 14-16.)   In support of this allegation, Plaintiff relies on several apparent inaccuracies in MSU's investigatory report, which was prepared by Barbara Milton, MSU's Equal Opportunity/Affirmative Action Officer.  (Pl.'s Br. 14-16; Sarmiento Aff. Ex. 30.) Specifically, Plaintiff notes that the report incorrectly stated that Julie Farnum received her Ph.D. in May 2002, had taught graduate students, and recently completed a paper that would be published in May 2003.[9]  Aside from his own unsubstantiated theories, however, Plaintiff offers

---

[9]      The other "inconsistencies" Plaintiff cites on this point are not actual inconsistencies, but Plaintiff's subjective assessment of his own credentials and Farnum's.  (*See* Pl.'s Br. 15-16.)

no support for an inference that these inaccuracies were anything more than mistakes made by Milton in the preparation of the report.[10]

Furthermore, Plaintiff does not argue that the EEOC did not have accurate information at the time it rendered its determination or at the time it denied reconsideration, by which time the EEOC had received other detailed reports from MSU.  While Milton's initial report incorrectly stated that Farnum received her Ph.D. in May 2002, Franke subsequently reported to the EEOC at his interview that the Committee was in fact aware that Farnum did not have her Ph.D. until after she was selected.  (Sarmiento Aff. Ex. 5 at 3.)  At the interview, which occurred after Milton's report had been submitted to the EEOC and before the EEOC had issued its determination letter, Franke also noted that the Committee had required Farnum to send completed chapters of her dissertation.  (*Id.*)  He also described the University's policy on hiring candidates who are on the verge of completing their Ph.D.s.  (*Id.*)  In its request for reconsideration of the EEOC's determination, MSU also discussed MSU's conditional offer to Farnum and the steps taken to verify that Farnum was on the verge of receiving her degree and had completed all requirements by September 2002.  (Sarmiento Aff. Ex. 33.)  Plaintiff asserts that "[i]t is clear that Julie Farnum did not have her degree when she started working," and did not receive her degree until December 2002, and argues that MSU's statements to the contrary strongly indicate mendacity on the part of Franke.  (Pl.'s Br. 15.)  However, as discussed *supra* in Part III.A.2, the precise date that Farnum's Ph.D. was ultimately conferred is not material.  Lynde testified that MSU considers the degree to have been attained when all requirements have been

---

[10]      Plaintiff cites to portions of a transcript he prepared of his deposition of Barbara Milton, which provide no support for his theory that the inconsistencies reflect "duplicity" on behalf of MSU.  (*See* Sarmiento Aff. Ex. 41; Pl.'s Br. 16.)

met, rather than focusing on the actual conferral date of the degree.  (Lynde Dep. 8:20-9:24.)

Ultimately, Plaintiff's assertion that Farnum's degree was not actually *conferred* until December

2002 is not inconsistent with MSU's assertions that she had *completed all requirements* for the

degree as of September 2002.

Plaintiff also points to a sentence in Milton's initial report stating that Franke had

indicated that "all applicants were asked to submit evidence of their teaching experience."

(Sarmiento Aff. Ex. 30; Pl.'s Br. 15-16.)  Franke clarified this statement at his deposition by

stating that all applicants, *after* the Committee had decided upon a short list, were asked to

submit evidence of teaching experience (e.g., course outlines) if they had not already done so.

(Franke Dep. II 51:4-19.)  Franke agreed that applicants were not required to submit evidence of

teaching experience in the initial application package.  (*Id.* 52:10-13.)

In any event, the fact that Milton's initial report to the EEOC was not entirely accurate or

complete does not create a material issue for trial.  It does not evidence a plan by MSU to hide

information from the EEOC, and the EEOC certainly made no such finding in its determination

letter.  (*See* Sarmiento Aff. Ex. 32.)  Most significantly, the inconsistencies Plaintiff cites do not

contradict any of the "core facts" MSU has put forth to justify its hiring decision, nor do they cast

doubt on the credibility of the individuals who made the decision not to interview or hire

Plaintiff.  *See Tomasso*, 445 F.3d at 706; *Fuentes*, 32 F.3d at 765.

### 2.      *Refusal to Hire a Hispanic Anthropologist*

Plaintiff argues that given the fact that there are no Hispanics in the anthropology

department at MSU, and that Franke has testified that Plaintiff is a highly-qualified

anthropologist with an outstanding record, "there is no legitimate reason why the committee

would not have hired the plaintiff to correct their Hispanic under-representation."  (Pl.'s Br. 17-

18; Sarmiento Aff. Ex. 5 at 2; Franke Dep. II 80:4-13.)  Plaintiff asserts that according to

university policy, MSU could have authorized a second position if the PAC Chair, Franke, had

identified a "highly qualified faculty" who was an under-represented minority.  (Pl.'s Br. 17.)  He

argues that, considered in combination with MSU's refusal to conciliate the EEOC charge,

"[t]he fact that the department does not want Hispanic faculty seems an inevitable conclusion."

(*Id.*)  The Court disagrees.  The record contains abundant evidence of MSU's legitimate reasons

for determining that despite his impressive credentials, Plaintiff's research interests and areas of

specialization were not in line with what MSU sought for its anthropology department and for its

students.  (Franke Dep. II 86:5-15, 103:22-113:20, 113:7-20, 116:2-117:9, 127:3-129:15, 131:16-

137:14, 161:7-16, 166:18-23.)  Under the circumstances, it does not stand to reason that MSU

should nonetheless be expected to create a position for Plaintiff because of his national origin.

Plaintiff also alleges that the department deviated from MSU's internal affirmative action

guidelines by filing its internal affirmative action recruitment forms after Farnum was offered the

position.  (Pl.'s Br. 18.)  This fact is not material, nor does it evidence a departmental refusal to

hire Hispanic professors.

In sum, the evidence cited by Plaintiff fails to support his conclusion that MSU's

anthropology department does not want to hire Hispanic faculty.

### 3.    *Loss and Destruction of Evidence*

Plaintiff argues that MSU "intentionally and willfully" destroyed records pertaining to the

hiring process, and asks this Court to infer that these records would have provided evidence of

discrimination.  (Pl.'s Br. 18-20.)  The missing documents include the PAC members' notes

ranking the various applicants, in addition to portions of the applications received from Farnum,

Leslie and Plaintiff.

With respect to the PAC members' notes, Franke testified that committee members did bring notes on the applicants to the initial meeting at which applicants were ranked, but that the notes had been destroyed following the completion of the search according to routine department policy.  (Franke Dep. II at 78:24-79:19.)  In response to a request for information by the Department of Justice during its investigation of Plaintiff's EEOC charge, MSU shed further light on what notes were created and why they were destroyed, stating that according to departmental policy, each PAC member destroyed his or her notes and applicant scores promptly following the meeting "to preserve the confidentiality of the deliberative process of the [Committee] and protect the academic freedom of the University and the [Committee] members."  (Sarmiento Aff. Ex. 42 at 2.)  Though Plaintiff cites the wrong section of the code, he correctly points out that a federal EEOC regulation requires higher education institutions to retain records pertaining to the hiring process for two years.[11]  (Pl.'s Br. 19-20.) Plaintiff argues that the PAC's destruction of its notes violated this regulation, and that a spoliation inference is therefore justified.  (*Id.*)

Spoliation of evidence is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *MOSAID Tech., Inc. v. Samsung*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).  There is no rule of law mandating a particular sanction upon a finding of improper

---

[11]       Under 29 C.F.R. § 1602.49, "[a]ny personnel or employment record (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, tenure, demotion, transfer, layoff, or termination, rates of pay or other terms of compensation, and selection for training) made or kept by an institution of higher education shall be preserved by such institution of higher education for a period of two years from the date of the making of the personnel action or record involved, whichever occurs later."

destruction or loss of evidence; rather, such a decision is left to the discretion of the Court. *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 111 (E.D. Pa. 2005).  Although a regulation may supply the duty to preserve records, a party seeking to benefit from an inference of spoliation must still make out the other usual elements of a spoliation claim.  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 107, 109 (2d Cir. 2001).  In this Circuit, the sanction of a spoliation inference permits a jury to draw an adverse inference that the spoliated evidence "might or would have been unfavorable to the position of the offending party."  *MOSAID*, 348 F. Supp. 2d at 336 (quoting *Scott v. IBM Corp.*, 196 F.R.D. 233, 248 (D.N.J. 2000)).  Before imposing such a sanction, a court must find that four essential factors are satisfied.  First, the evidence in question must have been within the alleged spoliator's control.  *Id.* (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)).  Second, "it must appear that there has been actual suppression or withholding of the evidence."  *Id.* (quoting *Brewer*, 72 F.3d at 334).  Third, the allegedly spoliated evidence must have been relevant to claims or defenses. *Id.* (citing *Scott*, 196 F.R.D. at 248; *Veloso v. Western Bedding Supply Co.*, 281 F. Supp. 2d 743, 746 (D.N.J. 2003)).  Fourth, it must be "reasonably foreseeable that the evidence would later be discoverable."  *Id.* (citing *Scott*, 196 F.R.D. at 248; *Veloso*, 281 F. Supp. 2d at 746).

Applying these factors, the Court notes that it is not disputed that the PAC's notes were within their control, and that the notes were actually destroyed.  Whether or not the notes would have been relevant to Plaintiff's summary judgment defense is speculative.  However, the Court does not find that it was reasonably foreseeable, at the time the notes were destroyed, that they would later be discoverable.  The duty to preserve exists as of the time the party knows or reasonably should know litigation is foreseeable.  *MOSAID*, 348 F. Supp. 2d at 336.  In this case, the Defendant has presented uncontroverted evidence that such notes are routinely destroyed, and

35

that in the present situation, they were destroyed promptly after the Committee's decision-making meeting — well before plaintiff filed either his EEOC complaint or his complaint in this action, and thus prior to knowing that the notes could be discoverable.  (*See* Franke Dep. II at 78:24-79:19; Sarmiento Aff. Ex. 42 at 2.)  Defendant has also offered a neutral and reasonable rationale for the practice, namely to preserve the confidentiality of the deliberative process of the Committee and to protect the academic freedom of the University and the Committee members. (*See* Sarmiento Aff. Ex. 42 at 2.)  Under the circumstances, the Court finds that a spoliation inference is not warranted.

Even if the Court were to infer, as Plaintiff requests, that the destroyed notes might or would have been unfavorable to Defendant, the Court finds that such an inference would not affect the outcome of the instant motion.  In support of his argument, Plaintiff relies on the Second Circuit's decision in *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 107 (2d Cir. 2001).  Integral to the court's denial of summary judgment in *Byrnie*, however, was the fact that the record before it presented "a close case," and that the plaintiff had put forth "not insubstantial" evidence in support of his claims.  *See Byrnie*, 243 F.3d at 107, 110 ("In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.") (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1999).  The Court cannot describe the instant case as borderline, however, nor can we find that Plaintiff has put forth sufficient evidence in support of his claims such that a spoliation inference with respect to the destroyed notes would require the denial of summary judgment.

With respect to the missing supplemental application materials, Plaintiff himself acknowledges that these materials are "presumably lost." (Pl.'s R. 56.1 Stmt. 14, 17, 21-22; Pl.'s

36

Resp. to Def.'s R. 56.1 Stmt. ¶¶ 16, 21, 25.)  Regardless, the relevance of these particular

documents would be minimal, and their presence or absence does not in itself create an issue of

material fact.  Therefore, the Court finds that a spoliation inference as to these documents is also

unwarranted.  Nonetheless, because at this stage the Court views the evidence in the light most

favorable to Plaintiff, the Court has not considered these materials in evaluating the strength of

the finalists' applications versus the Plaintiff's.

> **E.      Combined Impact of Plaintiff's Assertions on MSU's Credibility**

In some cases a combination of factors, any of which judged on their own would be far

less compelling, can suffice to allow a reasonable jury to conclude that an employer's

explanation for an employment decision is a pretext for impermissible discrimination.  *See, e.g.*,

*Byrnie*, 243 F.3d at 102.  The Court must therefore contemplate whether Plaintiff's assertions,

taken together, could combine to cast substantial doubt on enough of MSU's proffered legitimate

reasons or to impede MSU's credibility seriously enough that a factfinder could rationally

disbelieve its proffered rationales.  *See Fuentes*, 32 F.3d at 764 n.7.  Having carefully evaluated

all of the evidence submitted on this motion, the Court concludes that Plaintiff has not

demonstrated sufficient weaknesses in Defendant's proffered nondiscriminatory rationale for its

hiring decision to create a genuine issue of material fact as to pretext.

The failures and anomalies noted by Plaintiff appear entirely race-neutral and do not, in

and of themselves, give rise to an inference of racially discriminatory animus.  *Williams*, 90 Fed.

Appx. at 629.  Although the Supreme Court has made clear that courts may not require

affirmative evidence of discrimination in addition to proof of pretext, *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), this fact "does not change our standard for

proving pretext, which 'places a difficult burden on the plaintiff.'"  *Kautz*, 412 F.3d at 467

(quoting *Fuentes*, 32 F.3d at 765).  In this case, the factual issues raised by the plaintiff simply do not provide sufficient evidence to allow a reasonable juror to conclude that Defendant's proffered reasons for Plaintiff's non-selection were a pretext for discrimination.

### CONCLUSION

For the reasons discussed herein, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.  An appropriate order accompanies this opinion.


Dated: May 9, 2007

 s/ William J. Martini

**William J. Martini, U.S.D.J.**